# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3086 | **DATE** | 9/2/2003 |
| **CASE TITLE** | EDUARDO CABALLERO vs. UNILOY MILACRON, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Uniloy's motion for summary judgment is granted in part and denied in part. Eaton's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 03 2003 date docketed | |
| | Notified counsel by telephone. | | | 105 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 03 SEP -2 PM 6:25 | date mailed notice | |
| LG | courtroom deputy's initials | FILED FOR DOCKETING Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDUARDO CABALLERO, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNILOY MILACRON, INC., a foreign corporation ) <br> and EATON HYDRAULICS, INC., formerly ) <br> known as VICKERS INCORPORATED, a foreign ) <br> corporation, ) <br> ) <br> Defendants. ) <br> _____ ) <br> ) <br> UNILOY MILACRON, INC. and EATON ) <br> HYDRAULICS, INC., ) <br> ) <br> Defendants/Third Party Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> LIQUID CONTAINER, L.P., ) <br> ) <br> Third Party Defendant. ) | No. 02 C 3086 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Eduardo Caballero ("Caballero"), filed a multi-count complaint against Defendants Uniloy Milacron, Inc. ("Uniloy") and Eaton Hydraulics, Inc. ("Eaton"), stemming from an injury he received while working on a plastics blow molding machine. Subsequently, the Defendants filed a third-party action against Caballero's employer at the time of the injury, Liquid Container ("Liquid"). Presently before the Court are Uniloy's and Eaton's Motions for Summary Judgment against Caballero.

DOCKETED SEP 0 3 2003

105

## BACKGROUND

The blow molding machine that Caballero was working on was not designed, manufactured or sold by Uniloy. Rather, Hoover Ball & Bearing Company ("Hoover") designed and manufactured the machine and sold it to Liquid in 1974. (Def.'s 56.1(a)(3) Statement ¶ A8)[1]. Hoover subsequently changed its name to Hoover Universal, Incorporated ("HVU"). (Id., ¶ A9).

In May 1985, a wholly-owned subsidiary of Johnson Controls, Incorporated ("Johnson"), known as HVU Acquisition Corporation, acquired the shares of common stock of HVU. HVU was then, and has for some time been, in the business of manufacturing various products, including plastics machinery manufactured under the brand name "Uniloy". (Def.'s 56.1(a)(3) Statement ¶ A10). In May 1985, HVU was merged into HVU Acquisition Corporation; and the name HVU Acquisition Corporation was changed to Hoover Universal, Inc. ("Hoover Universal"). (Id., ¶ A11). Since May 1985, Hoover Universal has been a wholly-owned subsidiary of Johnson. (Id., ¶ A12).

On September 30, 1998, Johnson and Hoover Universal completed the sale of the plastics machinery manufacturing business of Hoover Universal, referred to as the Plastics Machinery Division, to Cincinnati Milacron, Inc. (now known as Milacron). (Def.'s 56.1(a)(3) Statement ¶ A13). The purchase agreement allowed Cincinnati Milacron, Inc. to insert one of its affiliates, Uniloy, a wholly-owned subsidary, as the purchaser. (Id., ¶ A14). Uniloy did not come into existence until September 22, 1998, when the Certificate of Incorporation was filed with the Secretary of State of Delaware. (Id., ¶ A15). The asset purchase agreement specifically provides that Uniloy did not assume liability for products shipped prior to September 30, 1998. (Id., ¶ A18).

---

[1] Uniloy's Statements of Material Fact are designated by the prefix "A". Eaton's Statements of Material Fact are designated by the prefix "B".

Milacron Inc. is a publicly traded company on the New York Stock Exchange. (Id., ¶ A22). No directors of officers of Hoover Universal or Johnson have served as directors or officers of Uniloy since it was formed. (Id., ¶ A25). No stockholders, directors, or officers of Hoover Universal have ever been stockholders, directors or officers of Uniloy. (Id., ¶ A26).

From September 22, 1998 through the present, Uniloy has been a manufacturer of plastics blow molding machinery. (Def.'s 56.1(a)(3) Statement ¶ A17). Uniloy was not involved in any way with the original design, manufacture or sale of the blow molding machine that is the subject of the instant lawsuit. (Id., ¶ A16).

Since Septmeber 30, 1998, Uniloy has maintained a service department and has offered technical support and maintenance service to machine owners. (Def.'s 56.1(a)(3) Statement ¶ A29). Any service provided on a machine by Uniloy technicians is performed on a "need" basis. If Liquid ever requested services on one of its machines, Uniloy would send a technician to the Liquid plant, and Liquid would be charged for the services. (Id., ¶ A31).

Uniloy employee Richard Cooper ("Cooper") has been servicing Hoover Universal Machines since he was first employed by HVU in 1975. He trained customers in the operations and maintenance of Model 350R2. He was employed by Johnson after Johnson bought Hoover Universal in 1985 and had manufacturing responsibilities for Johnson for Model 350R2. He later became customer service manager for Johnson and remained in that position for Uniloy when Uniloy purchased Johnson. (Plaint.'s 56.1(b)(3) Statement ¶ 60).

Eugene Ridenour ("Ridenour") was customer service manager for Hoover Universal beginning in 1979; and when Johnson bought Hoover Universal in 1985, he became technical consultant for product safety until his retirement in 1990. (Plaint.'s 56.1(b)(3) Statement ¶ 61).

3

Douglas Sten ("Sten") began work for Johnson in 1992 until July 31, 2001. With his job responsibilities unchanged, Sten stayed with Uniloy as manager of product safety when Uniloy purchased Johnson. (Plaint.'s 56.1(b)(3) Statement ¶ 62).

Johnson and Uniloy offered technical and maintenance support for owners of model 350R2. From time to time, the service department of the three companies -- Hoover, Johnson and Uniloy -- would issue safety bulletins to owners of Model 350R2. This was a continuing practice for each of the companies originating before 1992. (Plaint.'s 56.1(b)(3) Statement ¶ 64). The bulletins were issued to give safety advice and to tell customers about upgrades, retrofits, and new electronics. (Id., ¶ 65).

Liquid owned eleven "Uniloy" brand blow molding machines. (Def.'s 56.1(a)(3) Statement ¶ A31). Uniloy sold replacement parts for the "Uniloy" machines to Liquid. (Id., ¶ A32).

On January 3, 2000, Caballero and a coworker, Jose Miranda ("Miranda"), were trouble-shooting the blow molding machine identified as a "Uniloy" Model 350R2 with Serial Number 2697. (Def.'s 56.1(a)(3) Statement ¶ A33). Caballero and Miranda were attempting to correct a "mold over-travel" problem which occurred upon a cold start-up after the long holiday weekend. (Def.'s 56.1(a)(3) Statement ¶B3). While attempting to correct the mold over-travel problem, Miranda would close the molds by pushing or activating the 9CR relay inside the electrical cabinet of the operator's side of the machine which would enable the molds to close even though they had opened beyond the electric eye which halted the normal operation of the machine. (Id., ¶ B4). After the molds closed, Caballero would open the molds by pressing the "mold open" button on the side of the machine adjacent to the safety gate. (Id., ¶ B5). Caballero and Miranda opened and closed the molds utilizing this method of pressing the "mold open" button and pressing the 9CR relay inside

4

the electrical cabinet for several cycles. (Id., ¶ 6). While Miranda was working inside the electrical cabinet on the side of the machine, Caballero opened the safety gate and reached in between the molds to retrieve a piece of plastic when the molds closed on his hand upon the "mold close" activation by Miranda inside the electrical cabinet. (Id., ¶ B7)

There are three ways to correct an over-travel problem: (1) the electrical one, used by Caballero and Miranda, by moving the molds by activating 9CR; (2) a hydraulic one, which involves manually activating a hydraulic directional valve; and (3) manually moving the molds. (Plaint.'s 56.1(b)(3) Statement ¶ 36). The machine manufacturer's manuals or technical bulletins did not prescribe or stipulate a method for troubleshooting an over-travel problem. (Id., ¶ 37). The method used by Caballero to correct the over-travel problem was a method known by the machine's manufacturer. (Id., ¶ 38). In order for Caballero to be injured, both the electrical and hydraulic safeties had to be overcome. (Def.'s 56.1(a)(3) Statement ¶ A34). The electrical safety was overridden as part of the troubleshooting. (Id., ¶ A35). Caballero understood that he was to turn off the hydraulic pump when working between the molds. (Def.'s 56.1(a)(3) Statement ¶ B8). Caballero testified at his deposition that he had turned off the hydraulic power to the machine. (Id., ¶ B9). Miranda testified at his deposition that the hydraulic power was on during the troubleshooting on the morning of January 3, 2000. (Id., ¶ B11). It is impossible for the molds to move without hydraulic power to the machine. (Id., ¶ B10).

Within a half hour of Caballero's injury, Liquid's plant engineer, Michael Auth ("Auth"), investigated why the injury had occurred. After conducting various tests, Auth determined that the Vickers' hydraulic directional valve was stuck in the open, or operating, position. In the closed

5

position, the valve stops the flow of hydraulic fluid and power to the molds. (Plaint.'s 56.1(b)(3) Statement ¶ 44).

The machine's electrical system was designed and manufactured so that no safety switch would interrupt the flow of power along wire number 5 between the machine's power source and the mold, when 9CR is manually activated; and electrical power will flow along wire 5 without interruption and will close the molds when 9CR is manually activated, even with the safety gates open. (Plaint.'S 56.1(a)(3) Statement ¶ 45). Auth testified that the electrical circuitry in the machine was not a good design, based on principles applicable when it was manufactured, because there was no safety interrupt on wire 5. A reasonably careful designer of the electrical system would have used a safety interrupt in the circuit, and a reasonably careful manufacturer should have foreseen and anticipated the possibility of the valve sticking. (Id., ¶ 53).

Uniloy periodically sent bulletins to remind customers of safety issues and inform them of machine enhancements. (Def.'s 56.1(a)(3) Statement ¶ A36). A Uniloy safety bulletin, dated November 1999, included the warning statement: "<u>DANGER</u> Failure to daily test and verify the proper operation of the hydraulic safety interlocking system following the procedures provided may result in severe injury." (Id., ¶ A37). The same bulletin also explained, "Recently, it was discovered that a hydraulic blocking valve stuck in the open position during a setting realignment and the clamps closed when the electrical interlocking system was manually by-passed." (Id., ¶ A38). The incident referenced in and giving rise to the November 1999 safety bulletin occurred in California and was reported in a field report dated August 18, 1999. (Id., ¶ A39).

In the normal course of its business, Uniloy sent safety bulletins to identified contact people at various customers' locations, including Liquid. (Def.'s 56.1(a)(3) Statement ¶ A40). The

6

November 1999 safety bulletin would have been sent to Liquid between November 15 and November 30, 1999. (Id., ¶ A41). At least one Liquid employee admits it received the November 1999 safety bulletin. However, he did not receive it until after Caballero's accident. (Id., ¶A42).

The Hoover Universal operator's manual in possession of Liquid included the following safety instruction:

> It is extremely important, for the safety of the operator, that these safety doors and their interlocking systems are kept in good working order. Each day they should be inspected and checked to insure proper operation.

(Def.'s 56.1(a)(3) Statement ¶ A43). Prior to Caballero's accident, Liquid conducted no daily test of the safeties. Rather, its established procedure was to weekly check the operation of the safety doors but in a manner that would not detect the operation of the hydraulic safety system -- pressing the "mold close" button and opening a safety gate while the clamp was in motion to make sure the clamp was stopped immediately. (Id., ¶ A44).

The operator's manual also prescribed the following two daily safety tests:

> Each of the four doors should be checked separately as follows:
>
> [1] With one door open, attempt to close the molds with the Mold Close pushbutton. They should not move. [2] Next, manually shift the Rotac directional control valve and while holding the valve in first one shifted position and then the other, observe the clamp for motion. There should be none. Repeat this procedure on all doors.

(Def.'s 56.1(a)(3) Statement ¶ A45). Liquid never performed the second of these tests. Thus, it never checked the hydraulic safety system on a weekly, or other, basis. (Id., ¶A46).

The blow molding machine involved in the accident had a warning sign installed on the safety gate which read: "HIGH PRESSURE CLAMP MAY CAUSE SEVERE CRUSHING

7

INJURY. ALWAYS STOP HYDRAULIC PUMP BEFORE OPENING SAFETY DOOR." (Def.'s 56.1(a)(3) Statement ¶ B13). Caballero was aware of this warning and knew that he should follow it. (Id., ¶ B14). The safety gates are meant to function as barrier guards between the machine operator and the molds. (Plaint.'s 56.1(b)(3) Statement ¶ 17). During normal operation of the machine, with the hydraulic and electrical systems on and operational, opening the safety gates stops all movement of the molds. (Id., ¶ 18).

One of the blow molding machine's safety features was a "safety circuit" that featured a hydraulic directional valve which shifts open to allow the flow of hydraulic oil to the molds when the safety gates are closed and which halts the flow with the gates opened. (Def.'s 56.1(a)(3) Statement ¶ B15). Another element of the machine's safety circuit is an electrical interlock on the safety gate which prevents electrical power from flowing to the hydraulic directional valve in the event the safety gates are opened during machine operation. (Id., ¶ B16).

One usage for the valve involved in this case was its use as a hydraulic component of a safety system in blow molding machines. (Plaint.'s 56.1(b)(3) Statement ¶ 19). Eaton manufactured the valve. The valve's intended function was to block hydraulic pressure when a safety gate was opened. (Id., ¶ 20). Eaton knew that their hydraulic valves could stick. (Id., ¶ 21). A reasonably careful blow molder manufacturer would know of the valve's tendency to stick. (Id., ¶ 23). Shutting off the machine's hydraulics would not necessarily relieve the pressure on a stuck valve. (Id., ¶ 24).

The Uniloy prescribed procedure to correct a mold over-travel problem is to turn the hydraulic pump off and manually push the clamp across the electric eye or for the operator to go to the back side of the machine and the hydraulic compartment and manually actuate the clamp open/close valve. Alternatively, one could manually actuate the valve. (Def.'s 56.1(a)(3)Statement

8

¶ B17). When the 9CR is bypassed inside the electrical cabinet, as Miranda was doing at the time of the accident, the electrical safety is bypassed. (Id., ¶ 18). The electrical and hydraulic safeties in the safety gate circuit were redundant safety elements. (Id., ¶ 19).

Eaton had no role in the manufacture of the blow molding machine. (Def.'s 56.1(a)(3) Statement ¶ B12). Eaton's subject valve was a component in the subject blow molding machine. (Id., ¶ B23). The subject valve was purchased at some point by Liquid from a distributor. (Id., at ¶ B21). Liquid installed the valve in the blow molding machine. (Id., ¶ B22). Eaton had no control over Liquid's use of the subject valve, and no one from Eaton had ever been to Liquid. (Id. ¶ B24). Eaton did not send literature to Liquid. (Id., ¶ B25).

Caballero disclosed two opinion witnesses in this case, Andrew Tudor ("Tudor") and Richard Kragh ("Kragh"). (Def.'s 56.1(a)(3) Statement ¶ B26). Kragh, an electrical engineer, expressed no opinions with respect to Eaton. (Id., ¶ 27). Kragh opined that the machine: (1) was unreasonably dangerous and defective as designed and manufactured because it lacked proper interlocking, (2) was negligently designed and manufactured for the same reason, and (3) could have been made safe simply by supplying electrical power to the molds from wire 29 rather than wire 5. (Plaint.'s 56.1(b)(3) Statement ¶ 55).

In his deposition, Tudor testified that he did not have any criticism with regard to the design or manufacture of the hydraulic directional valve. (Id., ¶B28). Tudor also testified that there was not a particular valve available that could replace the valve at issue that would be suitable for the safety application of the blow molding machine. He suggested that the safety circuit could be improved by installing an additional valve to the safety circuit to monitor the hydraulic pressure. (Id., ¶ 30) Tudor did not conduct any testing of the subject valve or of the blow molding machine. (Id., ¶ B29).

9

Tudor opined that: (1) the manufacturer of the machine did not exercise reasonable care in the design of the machine and that it was foreseeable that access was needed to the mold area for service and troubleshooting and that the danger posed by the molds closing on human parts was known to the manufacturer and borne out by the safety design literature; (2) the subsequent companies, in their ownership and safety dealings with Liquid, never addressed or disclosed the system safety defect; (3) the subject machine was in violation of the American National Standard for Plastics Machinery - Extrusion Blow Molding Machines - Safety Requirements for Construction, Care, and Use - ANSI B 151.15 - 1985; (4) the machine lacks a safety circuit that can be used for troubleshooting, set up, and servicing activities; (5) the machine manufacturer did not provide a cold-start procedure nor an over-travel troubleshooting guide; (6) the safety gate was open, rendering the system apparently safe for troubleshooting and set-up activities; however, the failure of the Vickers valve in the safety circuit rendered the machine system unsafe and led to the accident; and (7) the valve is not fit for its intended use due to a failure mode that leads to potential death, and the valve manufacturer should carry a warning sufficiently specific that this valve is not to be used in a safety circuit due to the inherent defect associated with its safety performance. (Plaint.'s 56.1(b)(3) ¶ 56).

Tudor further opined that the safety circuit on the blow molding machine failed because the subject valve stuck in the actuated position. (Def.'s 56.1(a)(3) Statement ¶ B31). Tudor criticized that Eaton did not issue a warning that the subject valve should not be used in a safety circuit because hydraulic valves have the potential to stick. Tudor did not develop a specific warning or instruction that should have been used in this case. (Id., ¶ B32).

Tudor opined that the failure of the safety circuit, along with other factors including Miranda's bypassing electrical interlocks, contributed to Caballero's injuries. (Def.'s 56.1(a)(3) Statement ¶ B33). Tudor believed that the potential for the valve to stick was well known in the industry at the time the subject valve in question left Eaton's control. (Id., ¶ B34). Dave Degrandchamp ("Degrandchamp") and Paul Smith ("Smith"), Eaton's representatives, concurred that the potential for the valve to stick was well known in the industry. (Id., ¶¶ B35-B36). Auth also believed that the potential for hydraulic valves to stick was well known in the industry. (Id., ¶ B38).

Eaton's literature warns of the valve's potential stick. The literature states: "Any sliding spool valve, if held shifted under pressure for long periods of time, may stick and spring return due to fluid residue formation and, therefore, should be cycled periodically to prevent this from happening." (Def.'s 56.1(a)(3) Statement ¶ B40).

Following the accident, the subject valve was removed from the blow molding machine by Liquid. The valve was dismantled by Auth and partially taken apart. The valve was not "totally" disassembled. (Def.'s 56.1(a)(3) Statement ¶ B43; Plaint.'s 56.1(b)(3) Statement ¶ 68).

Before his injury, Caballero's experience had been that opening a safety gate stopped all movement of the molds. At the time of the accident, Caballero's expectation was that opening a safety gate would stop all movement of the molds. (Plaint.'s 56.1(b)(3) Statement ¶ 27). Caballero's expectation that opening a safety gate would stop all movement of the molds was a reasonable or common expectation according to several individuals familiar with the machine. (Id., ¶ 29). However, Caballero also testified that he knew he had to turn off the hydraulics before putting his hands near the molds because he "never knew what's going to happen with the machine." (Caballero's Dep. pp. 123-24).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The parties concede that Illinois law is the proper law applied to this product liability action in this Court. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *Kramer v. Weedhopper of Utah, Inc.*, 204 Ill. App. 3d 469, 478 (1990).

*Uniloy's Motion for Summary Judgment*

Caballero's Amended Complaint contains three counts against Uniloy. Count I alleges a strict liability claim for alleged defects at the time the machine was designed, manufactured, sold, and placed in the stream of commerce. Count II alleges a negligence claim for the negligent design, manufacture, marketing, and selling of the machine. Count V alleges a negligence claim for Uniloy's failure to warn of defects in the machine.

Uniloy first argues that summary judgment as to Counts I and II is proper because Uniloy is not liable for the design, manufacture, or sale of the blow molding machine at issue. Caballero and Liquid fail to address this argument in their response.

Generally, a successor corporation is not liable for the debts or liabilities of the old company. *See Nilsson v. Continental Mach. Mfg Co.*, 251 Ill. App. 3d 415, 417 (1993). Four exceptions exist

12

to the general rule of successor corporate nonliability: (1) where there is an implied or expressed agreement of assumption, (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation, (3) where the purchaser is merely a continuation of the seller, and (4) where the transaction is for the fraudulent purpose of avoiding liability for the seller's obligations. *See Vernon v. Schuster*, 179 Ill. 2d 338, 345 (1997).

In the instant case, Uniloy is the successor corporation of the designer, manufacturer, and seller of the alleged defective machine. Furthermore, none of the exceptions to successor nonliability are applicable based on the undisputed facts set forth above. Accordingly, summary judgment is granted in Uniloy's favor on Counts I and II.

Uniloy next argues that summary judgment as to Count III should also be granted because it did not have a duty to warn Liquid of the alleged defects in the blow molding machine.

A duty is defined as "a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another. [Citations.]" *Kurtz v. Wright Garage Corp.*, 262 Ill. App. 3d 1103, 1107 (1994). Whether a duty exists is a question of law to be determined by the court. *See Adams v. Northern Ill. Gas Co.*, 333 Ill. app. 3d 215, 219 (2002).

Illinois courts have recognized a limited cause of action against the purchaser of a product line for failing to warn of defects in its predecessor's products. *See Kaleta v. Whittaker Corp.*, 221 Ill. App. 3d 705, 715 (1991) (*Kaleta*); *Gonzalez v. Rock Wool Eng. & Equip. Co.*, 117 Ill. App. 3d 435, 438 (1983) (*Gonzalez*). The critical element required for imposition of such a duty is a continuing relationship between the successor and the predecessor's customers benefitting the successor. *See Gonzalez*, 117 Ill. App. 3d at 438. The following factors are considered in making this determination: (1) succession to a predecessor's service contracts, (2) coverage of the particular

13

machine under a service contract, (3) service of that machine by the purchaser corporation, and (4) a purchaser corporation's knowledge of defects and the location or owner of that machine. *See Kaleta*, 221 Ill. App. 3d at 715.

Here, Uniloy was not a successor to the predecessor's service contracts, and it did not cover the blow molding machine under a service contract. In addition, there is no evidence that Uniloy ever serviced the blow molding machine. However, Uniloy did have contact with Liquid, sold replacement parts to Liquid, and did provide safety bulletins periodically to its customers, including Liquid. Under similar facts in both *Kaleta* and *Gonzalez*, the courts found that no duty existed.

In *Gonzalez*, the successor corporation continued to manufacture machines similar to the alleged defective machine, maintained contact with the predecessor's customers, and sold spare parts to the customers. *Gonzalez*, 117 Ill. App. 3d at 436. However, the successor corporation did not have a service contract with the customer, was not a successor to the predecessor's service contracts, and had not serviced the machine in question. Based on these facts, the court found that a continuing relationship did not exist. *Gonzalez*, 117 Ill. App. 3d at 438; *see also Kaleta*, 221 Ill. App. 3d at 716 (no continuing relationship when successor corporation did not have a written service contract covering the subject machine and was not a successor to the predecessor's service contracts); *Modelski v. Navistar Int'l Trans. Corp.*, 302 Ill. App. 3d 879, 888 (1999) (finding that the original manufacturer has "no duty to warn" of dangers that first came to its "knowledge" after the product left its control).

In light of the factors to be reviewed, the relationship between Uniloy and Liquid did not impose a duty upon Uniloy to warn. *See Gonzalez*, 117 Ill. App. 3d at 438; *Kaleta*, 221 Ill. App. 3d at 716.

14

Caballero also seeks to impose a duty to warn under the voluntary undertaking theory of negligence liability.

Under the voluntary undertaking theory of liability, one who gratuitously or for consideration renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or such competence and skill as one possesses (citations and quotations omitted). *See Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 31 (1992) (*Frye*). The duty of care imposed upon a defendant under this theory of liability is limited to the extent of its undertaking. *See Frye*, 153 Ill. 2d at 33. Furthermore, the plaintiff must rely on the voluntary undertaking. *See Petty v. Chris-Kare, Inc.*, 264 Ill. App. 3d 429, 435 (1994).

Uniloy concedes that it voluntarily undertook to send its customers, including Liquid, safety recommendations. Accordingly, Uniloy had a duty to exercise due care and such competence and skill as it possessed. Uniloy also concedes that it sent out a safety notice following an accident in California that was similar to the accident in the present case. Whether Uniloy breached its duty in regards to the safety notice following the California accident cannot be determined at this time. Questions of material fact exist as to if and when the notice was sent to Liquid and if and when Liquid received the notice. In addition, questions of material fact exist as to whether Liquid relied upon the safety bulletins. Accordingly, summary judgment as to Count V is denied.

*Eaton's Motion for Summary Judgment*

Caballero's Amended Complaint contains two counts against Eaton. Count III alleges a strict liability claim for alleged defects of the directional valve at the time the valve was designed, manufactured, sold, and placed in the stream of commerce. Count IV alleges a negligence claim for the negligent design, manufacture, marketing, and selling of the valve.

To prevail in a product liability action, a plaintiff must prove: (1) that his injury resulted from a condition of the product, (2) that the condition was an unreasonably dangerous one, and (3) that the condition existed at the time the product left the manufacturer's control. *See Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002) (*Sollami*). A product may be found unreasonably dangerous by virtue of a design defect, a physical flaw, or the failure of the manufacturer to warn of the danger or instruct on the proper use of the product as to which the average consumer would not be aware. *See Sollami*, 210 Ill. 2d at 7.

Caballero alleges that the design of the directional valve was defective and unreasonably dangerous because it could become stuck and that Eaton knew that it could become stuck and that it was used in a safety system.

Illinois recognizes two different tests for determining whether a product is unreasonably dangerous as to its design: (1) the consumer contemplation test and (2) the risk-utility test. *See Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 433-36 (2002) (*Hansen*); *McDaniel v. Trail King Industries, Inc.*, 248 F. Supp. 2d 749, 754 (N.D. Ill. 2002) (*McDaniel*).

Under the consumer expectation test, a product is unreasonably dangerous when it is dangerous to an extent beyond that which would be expected by the ordinary consumer who would purchase the product. *See McDaniel*, 248 F. Supp. 2d at 756. In the instant case, the alleged defect in the valve is that it becomes stuck. However, the undisputed facts show that the consumers of such valves knew that all vales of this type stick. Accordingly, the valve's sticking is not dangerous to an extent beyond that which would be expected by the ordinary customer of the valve.

Under the risk-utility test, a product is unreasonably dangerous if the product's design proximately caused the plaintiff's injury and the defendant fails to prove that, on balance, the

16

benefits of the challenged design outweigh the risk of danger inherent in such a design. *See Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990). However, under Illinois law, in order to show that a product is unreasonably dangerous, a plaintiff must present an alternative design that is "economical, practical, and effective." *See Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 380 (7th Cir. 2000); *Hansen*, 198 Ill. 2d at 436.

In the present case, Caballero has presented evidence that the valve's design was one of the proximate causes of his injury. Eaton has not demonstrated that the benefits of the challenged design outweigh the risk inherent in the design. However, Caballero has not presented any evidence of an alternate design that is economical, practical, and effective. While Caballero's expert opined that the blow molding machine could be designed to be safer, neither of Caballero's experts opined that an alternate design of the valve was possible or that the valve itself was defective.

Furthermore, under Illinois law, component part manufacturers are not liable in strict liability where its product is only dangerous because another installs the product into a larger system. *See Rotzoll v. Overhead Door, Corp.*, 289 Ill. App. 3d 410, 418 (1997). In the instant case, while Caballero's expert opined that the blow molding machine could be designed to be safer, neither of Caballero's experts found the valve itself to be defective in its design or manufacture. All of the experts and non-experts agreed that the valve functioned as a valve usually functions, including sometimes sticking.

Based on the above, the directional valve was not unreasonably dangerous because of its design.

Caballero also argues that the directional valve was unreasonably dangerous because Eaton failed to warn that the valve could stick and, as such, should not be used in safety systems.

17

A product may be unreasonably dangerous because the manufacturer fails to warn of a danger or instruct on the proper use of the product as to which the average consumer would not be aware. *See Sollami*, 201 Ill. 2d at 7. The manufacturer only has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm and the manufacturer possessed such knowledge, knows or should know that harm may occur absent a warning. *See Sollami*, 201 Ill. 2d at 7. No duty to warn exists where the danger is open and obvious or apparent. *See Sollami*, 201 Ill. 2d at 7.

The basis of Caballero's failure to warn allegation is that Eaton was aware that its valve could and did stick. However, as noted above, the valve's propensity to stick was well known within the industry. Accordingly, the average consumer of the valve would have been aware of the alleged defect; and Eaton had no greater knowledge with respect to the risk of harm than the consumer purchasing the valve. Therefore, Eaton did not have a duty to warn that the valve could stick or that the valve should not be used in safety systems because it could stick.

Based on the above, Eaton's Motion for Summary Judgment as to Count III is granted.

Lastly, the above analyses applies equally to Caballero's negligence claims against Eaton for negligent design and failure to warn. *See Rotzoll*, 289 Ill. App. 3d at 419. Accordingly, Eaton's Motion for Summary Judgment as to Count IV is granted.

## CONCLUSION

For the foregoing reasons, Uniloy's Motion for Summary Judgment is granted in part and denied in part. Eaton's Motion for Summary Judgment is granted.

Dated: September 2, 2003

_____
JOHN W. DARRAH
United States District Judge